IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 1, 2023

IN RE A'JAYI A.

Appeal from the Chancery Court for Madison County
No. 79491    Steven W. Maroney, Chancellor
_____

No. W2022-01617-COA-R3-PT
_____

Two relatives filed competing petitions to adopt a minor child after his mother's death. The child's father was unknown. The trial court conducted a comparative fitness analysis and found that it was in the best interest of the child to be adopted by the child's maternal grandfather. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and KENNY W. ARMSTRONG, JJ., joined.

Lanis L. Karnes and Jennifer C. Covellis, Jackson, Tennessee, for the appellant, Tiffany G.

Jennifer King, Jackson, Tennessee, for the appellees, Larry A. and Brenda A.

OPINION

I.

A.

A'Jayi ("Child") was born to Alexis A. ("Mother") and an unknown father in 2017. When he was about a month old, the Tennessee Department of Children's Services ("DCS") received a report that the Child was drug-exposed. After confirming Mother's illegal drug use, DCS created a non-custodial permanency plan. But due to repeated hospitalizations stemming from serious health concerns, Mother could not work the plan in a meaningful way.

DCS then filed a dependency and neglect petition. With Mother's consent, the juvenile court placed the Child in the joint temporary custody of two relatives, Larry A. ("Grandfather") and Tiffany G. ("Cousin"). Mother died in 2018. After her death, the juvenile court entered an agreed order adjudicating the Child dependent and neglected. It also decreed that the Child would remain in the joint custody of Grandfather and Cousin. Over time, disagreements arose between the joint custodians, and their relationship soured. In August 2020, Cousin petitioned the juvenile court for sole custody.

On September 11, 2020, Grandfather filed an adoption petition in chancery court. He also sought to terminate the unknown father's parental rights.[1] A subsequent amended petition added Grandfather's wife, Brenda, as a co-petitioner.

Cousin filed a motion to intervene, which the court granted. Complaining that Grandfather had recently denied her any contact with the Child, Cousin asked the adoption court to enforce the joint custody order through the entry of a residential schedule or a visitation order. She also filed a competing petition to adopt. Grandfather moved to suspend the hearing on Cousin's request for visitation until after the resolution of the adoption petitions. Reasoning that adoption proceedings had priority over custody and visitation disputes, the court stayed the hearing on Cousin's motion. *See* Tenn. Code Ann. § 36-1-116(f)(2) (2021).

B.

The trial court heard evidence on the competing adoption petitions during a three-day trial in 2022. Grandfather and Cousin testified along with a DCS investigator, multiple family members, and friends.

None of the witnesses could adequately explain the origins of the joint custody arrangement. Grandfather and Cousin acknowledged that the temporary joint custody order erroneously indicated that both custodians lived at Grandfather's address. While Mother and the Child had always lived with Grandfather, Cousin did not. The joint custodians were not initially concerned about this discrepancy because they assumed the custody arrangement would be temporary. Yet after Mother died, the juvenile court's final order left the joint custody order in effect.

Cousin insisted that she was actively involved in the Child's care until August 2020, when Grandfather abruptly denied her access to the Child. Still, she conceded that for most of the Child's life, he lived primarily with Grandfather. Cousin visited the Child frequently

---

[1] Grandfather requested and received authorization to serve the unknown father by publication. *See* Tenn. Code Ann. §§ 21-1-203, -204 (2021); *see also id.* § 36-1-117(m)(3) (2021). The father did not appear or otherwise respond. After the trial, the court terminated the unknown father's parental rights.

and accompanied Grandfather to the Child's medical appointments. The Child also had occasional overnight visits at Cousin's home. In March 2020, Grandfather arranged for another cousin, NiJaia B., to assist with potty-training the Child. Because NiJaia lived with Cousin, the Child moved to Cousin's home where he remained until mid-August. Yet he also spent multiple weekends during that period with Grandfather and other family members.

At Grandfather's insistence, the Child attended a private preschool. Grandfather explained that the Child's social security benefits covered about half the tuition cost. He funded the difference. He acknowledged that Cousin shared some of that cost for about six months. But she stopped paying in January 2019. The preschool was closed during the spring and summer of 2020. Because of COVID-19 concerns, Grandfather did not want the Child to re-enroll when the preschool reopened that August. Cousin disagreed with his decision. Without Grandfather's consent, she enrolled the Child for the fall semester. The Child only attended a day or two before Grandfather unilaterally removed him in mid-August.

Cousin complained that Grandfather removed the Child from school without consulting her. And he did not respond to her repeated messages. Cousin claimed she had only seen the Child twice since August 2020, both times without Grandfather's permission. Citing trust issues, Grandfather maintained that he was protecting his grandson.

Cousin acknowledged that her relationship with Grandfather had been strained since 2019. Around that time, Cousin began questioning Grandfather about the money he received on behalf of the Child after Mother's death. He never shared that information with her. And he refused to add Cousin's name to the Child's bank account. She thought he was receiving a financial windfall at her expense. She also complained that he was unresponsive when she voiced concerns about the Child's care and development.

For his part, Grandfather maintained that Cousin was overly "bossy" and disrespectful. He complained that she made decisions about the Child without consulting or informing him. When the Child was living with Cousin, she secretly enrolled him in speech therapy. She also took the Child on an unscheduled trip to Chicago in the middle of a pandemic, only informing Grandfather when she was on the road. And she returned the Child to school knowing that it was against Grandfather's wishes.

Grandfather also disliked how Cousin had treated his wife, Brenda, and Mother. According to Grandfather, Cousin slapped Mother hard enough to leave a mark when they were on the way to a child and family team meeting at DCS. Grandfather tried to overlook that incident, but then it happened again. Shortly before his current marriage, Cousin forcefully confronted Brenda, who was in her sixties, and demanded that she refrain from any involvement with the Child. She hit Brenda in the face, breaking her glasses. Cousin admitted to hitting both women and expressed regret for her actions.

3

Despite their differences, Grandfather and Cousin both loved the Child. And the Child loved them. It was undisputed that the competing petitioners were each capable and willing to meet the Child's needs. At the time of trial, Grandfather was 63 years old, while Cousin was 46. Though Grandfather was older, he claimed to be in relatively good physical and mental health. Cousin, a self-employed behavior analyst, earned a higher income than Grandfather and Brenda, who were retired. Still, Grandfather and Brenda were financially able to care for the Child.

Based on the best interest factors in Tennessee Code Annotated § 36-6-106(a), the court analyzed the comparative fitness of the prospective adoptive parties. While it found that the Child had strong, nurturing relationships with Grandfather and his wife as well as Cousin, the court determined that it was in the Child's best interest to grant the adoption petition filed by Grandfather and Brenda.

**II.**

We review a non-jury case de novo upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* TENN. R. APP. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We give great deference to findings based on witness credibility, and we do not overturn such findings absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). Questions of law are reviewed de novo with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)).

A.

The touchstone in an adoption proceeding is the child's best interest. *See* Tenn. Code Ann. § 36-1-120(a)(13) (2021); *In re Adoption of A.K.S.R.*, 71 S.W.3d 715, 717 (Tenn. Ct. App. 2001). Tennessee's adoption statutes do not specify the procedure for evaluating competing adoption petitions. *In re Sidney J.*, 313 S.W.3d 772, 776 (Tenn. 2010). In such cases, our courts conduct a comparative fitness analysis using the factors in the child custody statute. *See* Tenn. Code Ann. § 36-6-106(a) (2021). This furthers the adoption statutes' goal of "ensuring that a child is placed in the best possible home." *In re Sidney J.*, 313 S.W.3d at 776.

The adoption court considered the parties' proof in light of the relevant statutory factors. And it found that adoption by Grandfather and Brenda was in the Child's best interest. Several key facts influenced the court's decision, including the extended period of time the Child had lived with Grandfather, the Child's attachment to his great-grandparents, and Cousin's episodes of physical violence.

4

The court found that Grandfather had been the Child's primary caregiver for most of his life. Other than one five-month period, the Child had lived with Grandfather since birth. *See* Tenn. Code Ann. § 36-6-106(a)(1), (5), (10). Cousin insists that she was the Child's primary caregiver until August 2020. But the evidence does not preponderate against the adoption court's finding. Cousin may have been the Child's primary caregiver for a short time. But by the time of trial, the Child had lived primarily with Grandfather for almost five years. Even if we were to ignore the two years that the adoption petitions were pending, as Cousin suggests, the evidence would not preponderate against the adoption court's finding.

While the Child had a "generally positive relationship" with Cousin, the court found the Child had a somewhat stronger bond with Grandfather due to the length of time he was in Grandfather's care. *See id.* § 36-6-106(a)(6). Cousin complains that her relationship with the Child was much stronger in August 2020. Still, the evidence does not preponderate against the court's finding. Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). That is not the case here.

As for each side's emotional and moral fitness to parent, the court acknowledged that Grandfather had shortcomings. *See* Tenn. Code Ann. § 36-6-106(a)(8). He abruptly removed the Child from school without providing any notice to Cousin. While his conduct may have been legally permissible, the court admonished him for not at least trying a more amicable approach. Yet the court was "more troubled" by the "repeated incidents of physical violence" between Cousin and her family members. Although the court stopped short of finding either party unfit, it found this factor "tilted strongly" in favor of Grandfather and Brenda. Cousin contends the court placed too much weight on these isolated events. Yet two separate incidents of physical aggression by a prospective adoptive parent are cause for concern.

The court found that the Child had the opportunity to interact with extended family in both homes, but Grandfather and Brenda were more likely to continue the Child's positive relationships with extended family members. The court noted that the Child was especially close to his great-grandparents, who were frequent visitors to Grandfather's home. Cousin's relationship with Grandfather, Brenda, and the great-grandparents was strained. Cousin protests that she has a good relationship with many family members. Still, the evidence does not preponderate against these findings.

The adoption court also found Grandfather and Brenda, being retired, had more time to devote to the Child. *See id.* § 36-6-106(a)(14). Cousin argues that her work schedule was equally flexible because she was self-employed. But again the evidence does not preponderate against the court's finding. As retirees, Grandfather and Brenda had more free time than Cousin even if she could set her own work schedule.

5

Cousin complains that the adoption court ignored the guardian ad litem's concerns about the age disparity between the competing petitioners. The court acknowledged the guardian ad litem's concerns. But it found that Grandfather was in good physical and mental health, as were his parents. The court had the opportunity to view the parties for three separate days. And there was no evidence that Grandfather's age impaired his ability to parent.

As to the remaining factors, the adoption court found that the factors either did not apply on these facts or the evidence was relatively equal. Cousin insists that the second factor, which considers each parent's willingness to foster a "close and continuing" relationship between the child and the other parent, was highly relevant on these facts. *See id.* § 36-6-106(a)(2). The court found this factor had less relevance outside the context of a custody dispute between two legal parents. So it gave this factor little or no weight. We cannot fault the court's reasoning. Extended family members do not occupy the same status as legal parents. *See In re Michael B.M.*, No. E2014-02481-COA-R3-JV, 2016 WL 358617, at *6 (Tenn. Ct. App. Jan. 29, 2016). Again, Grandfather's actions, while regrettable, were legally permissible.

In sum, the evidence does not preponderate against the court's findings. The record indicates that the prospective adoptive parties were fit and capable custodians. And the court had the difficult task of determining which party was comparatively more fit based on the evidence presented. Determining a child's best interest is particularly "fact-intensive." *Grissom v. Grissom*, 586 S.W.3d 387, 394 (Tenn. Ct. App. 2019). Adoption decisions, like custody decisions, "often hinge on subtle factors, including the [parties'] demeanor and credibility during the . . . proceedings." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Here, the court determined that the Child's best interest would best be served by granting the adoption petition filed by Grandfather and Brenda. We discern no basis in this record to overturn that decision. *See In re Sidney J.*, 313 S.W.3d at 778-79.

B.

Cousin also contends that the adoption court erroneously refused to consider her motion for entry of a residential schedule and/or for visitation. The court stayed the hearing on Cousin's visitation request based on Tennessee Code Annotated § 36-1-116(f)(2). With limited exceptions, once an adoption petition is filed, "any proceedings that may be pending seeking the custody or guardianship of the child or visitation with the child . . . shall be suspended pending the court's orders in the adoption proceeding." *Id.* § 36-1-116(f)(2). The suspended actions "shall not be heard until final adjudication of the action for . . . adoption regarding the same child, even if [the adoption decision] will render the custody, guardianship, or visitation action moot." *Id.* Even so, "until the adoption

6

court enters any orders affecting the child's custody . . . , all . . . prior court orders regarding custody . . . shall remain in effect." *Id.*

Cousin argues that she was not "seeking custody" or even "visitation with the child." Rather, she sought to enforce the existing custody order. Based on the plain language of this statute, we agree that Grandfather's adoption filing suspended all pending custody and visitation actions, but the joint custody order remained in effect. *See id.*; *In re K.A.Y.*, 80 S.W.3d 19, 23 (Tenn. Ct. App. 2002) ("[A]doption statutes are to be strictly construed."). And the adoption court had "exclusive jurisdiction of all matters pertaining to the child." *Id.* § 36-1-116(f)(1). Still, on these unique facts, we cannot say that the court committed reversible error in not taking up Cousin's request.

One goal of our adoption statutes is the prompt resolution of adoption petitions "to enable the child to achieve permanency, consistent with the child's best interests, at the earliest possible date." Tenn. Code Ann. § 36-1-101(a)(5) (2021). And prioritizing the adoption decision over ongoing custody and visitation disputes furthers that goal. *See In re K.A.Y.*, 80 S.W.3d at 26. Here, enforcing the joint custody order presented its own set of problems. Chief among those was the false premise underlying shared custody: that Grandfather and Cousin lived at the same address.

Cousin complains that the court's decision "changed the entire outcome of this case." The prolonged separation may have impacted Cousin's relationship with the Child. But we are not persuaded that the court's decision to stay the hearing on Cousin's request for visitation predetermined the outcome of the adoption. There was ample evidence of the Child's relationship with both sides before and after August 2020. Even if we discount the two years that the adoption proceeding was pending, the evidence does not preponderate against the court's best interest finding.

**IV.**

The adoption court's failure to enforce the existing custody order was not reversible error. Because the evidence does not preponderate against the court's findings, we affirm the decision.

_____s/ W. Neal McBrayer_____
W. NEAL MᴄBRAYER, JUDGE
